**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF NEW HAMPSHIRE**


Elijah E. Gross


        v.                                Civil No. 08-cv-517-JL


Mary Rose


**REPORT AND RECOMMENDATION**


        Before the Court is Elijah Gross' complaint (document nos. 1
& 13)[1], filed pursuant to 42 U.S.C. § 1983, alleging that the
defendant violated his rights under the United States
Constitution.  Gross is seeking damages and injunctive relief.[2]
The matter is before me for preliminary review to determine,
among other things, whether the complaint states any claim upon
which relief might be granted.  See 28 U.S.C. § 1915A(a); United

---

        [1]Gross filed his initial complaint on December 24, 2008
(document no. 1).  On February 2, 2009, Gross filed an addendum
including supporting documentation for the allegations in his
complaint (document no. 13).  Both of these documents will be
accepted, in the aggregate, as the complaint in this matter for
all purposes.

        [2]Gross' request for injunctive relief sought a return to
placement at the New Hampshire State Prison's Residential
Treatment Unit.  Gross reports, however, that he was returned to
that unit on November 24, 2008, and I therefore recommend
dismissal of the request for injunctive relief as moot.

States District Court District of New Hampshire Local Rule ("LR") 4.3(d)(2).  For the reasons explained herein, I recommend that this action be dismissed in its entirety.

Gross has also filed a motion seeking court-appointed counsel (document no. 15).  Because I recommend dismissal of this matter, I deny the motion to appoint counsel as moot.[3]

### Standard of Review

Under this Court's local rules, when an incarcerated plaintiff commences an action pro se and in forma pauperis, the magistrate judge is directed to conduct a preliminary review.  LR 4.3(d)(2).  In conducting the preliminary review, the Court construes pro se pleadings liberally, however inartfully pleaded. See Erickson v. Pardus, 551 U.S. 89, ___, 127 S. Ct. 2197, 2200 (2007) (following Estelle v. Gamble, 429 U.S. 97, 106 (1976) and Haines v. Kerner, 404 U.S. 519, 520-21 (1972) to construe pro se pleadings liberally in favor of the pro se party).  "The policy behind affording pro se plaintiffs liberal interpretation is that if they present sufficient facts, the court may intuit the correct cause of action, even if it was imperfectly pled."  See

---

[3]Should the District Judge elect not to follow my recommendation of dismissal, Gross is free to renew his motion as circumstances warrant.

2

Castro v. United States, 540 U.S. 375, 381 (2003) (noting that courts may construe pro se pleadings so as to avoid inappropriately stringent rules and unnecessary dismissals of claims); Ahmed v. Rosenblatt, 118 F.3d 886, 890 (1st Cir. 1997). All of the factual assertions made by a pro se plaintiff and inferences reasonably drawn therefrom must be accepted as true. See id.  This review ensures that pro se pleadings are given fair and meaningful consideration.

Background

Gross has been incarcerated at the New Hampshire State prison ("NHSP") since July 17, 2007.  Immediately upon his arrival at the prison, Gross began sending Inmate Request Slip ("IRS") forms to the NHSP Mental Health Unit ("MHU"), asking to be seen by a mental health professional so that he might be properly assessed and treated for his mental health problems.  On August 15, 2007, Gross was seen by a woman named Linda from MHU. Gross explained to Linda that he suffered from mental illness, including anxiety and depression, and that he was having a hard time as a result.  Gross told Linda he was shaking and vomiting, getting daily hives, and sleeping too much.  Linda ordered Benadryl for Gross and placed him on a waiting list for the

prison's Residential Treatment Unit ("RTU").  Linda declined, however, to treat Gross' anxiety or depression.  Gross alleges that her refusal to treat him was based on his history of illegal drug use.

On September 7, 2007, Gross was admitted to the RTU. Shortly after being admitted to the RTU, Gross was diagnosed with personality disorders, panic disorder, depression, anxiety disorder, attention deficit disorder, polysubstance abuse, opioid dependence, and a number of physical ailments.  While at the RTU, Gross asked to be treated with medications on a number of occasions.  The MHU workers, however, believing that Gross was seeking medication to feed his addiction rather than to treat his illness, refused to provide him with any medication for his mental illness at that time.  Gross does state, in his complaint, that at one point, he was given Trazodone, a sleep aid, but stopped taking it due to its unpleasant side effects.

Gross states that on December 7, 2007, after three months at the RTU, he lost his temper and beat up another inmate.  As a result, he was taken to the prison's Secure Housing Unit ("SHU") where he was locked in his cell for twenty-three hours a day, and told that he could reapply for admission to the RTU in sixty

days, as he had been doing well in the program.  Gross states that his depression got very bad while he was in SHU.  While in SHU, Gross sent many IRS forms to the MHU, seeking help for his depression, but his requests were ignored most of the time. Gross states that he did try to speak to MHU Director, Dr. Rick Fellows, on his daily rounds, but Dr. Fellows only told him to send an IRS to MHU.

On February 28, 2008, Dr. Wyly from MHU saw Gross and told him that he was on the waiting list to return to the RTU.  Dr. Wyly also told Gross that he would order medications for him for anxiety and depression.  Gross states that he did not received the prescribed medication, Buspar, for two weeks.  After a week on Buspar, Gross stopped taking it because the side effects, which included nausea, nervousness, suicidality, and anger, became unmanageable.  Gross sent an IRS to MHU on April 1, 2008 stating that he was depressed and anxious, that he couldn't take the medication that had been prescribed for him, and that he was in urgent need of mental health treatment.

On April 10, 2008, Gross saw Dr. Wyly again.  Dr. Wyly told Gross that he would order new medication to see if he could find one that would be effective.  Gross reports that Dr. Wyly never

prescribed any new medication for him, and that his IRS forms on
the subject went unanswered.  While he was at SHU, Gross states
that he was unable to attend two appointments at MHU, scheduled
for May 15, 2008 and June 26, 2008, because SHU inmates are not
taken to those appointments.

Gross was next sent to the North Unit at the NHSP.  There,
he saw Debby Green from MHU.  Green does not have the ability to
prescribe medication, so, Gross states, she was not able to do
very much for him.  Gross attempted to see the mental health
providers at the NHSP who could prescribe medication, including
Dr. Wyly and Mary Rose, but neither of them had available
appointments.

On July 22, 2008, Gross was sent back to SHU, apparently on
Pending Administrative Review status, as another inmate had
falsely accused Gross of misconduct.  On July 24, 2008, Gross
sent an IRS to MHU, stating that he would "freak the fuck out" if
he did not get something for his depression.  Gross reports that,
while he was at SHU, he got very depressed and became suicidal.
Gross told both the Medical Department and Dr. Fellows that he
was feeling suicidal but, he reports, no one took him seriously.
Gross tried to hang himself in his cell with his t-shirt, but

succeeded only in breaking blood vessels in his eyes and giving himself headaches.

On July 27, 2008, Gross asked two third shift officers for help, as he was feeling suicidal again.  Gross was then escorted to the Medical Unit to be placed on suicide watch.  Gross told the nurse in medical that he was so depressed he was sleeping most of the time, and wanted to die when he was awake.

On July 28, 2008, Mary Rose from MHU went to the suicide tank and told Gross that she believed that his claim of suicidality was a ploy to get himself released from SHU and to get medication to feed his addiction.  Rose further stated that Gross should be returned to RTU for treatment.  Rose told Gross that she would meet with him again after he was no longer in SHU. Gross asked Rose to prescribe medication for his depression. Rose told Gross she would think about it.

Rose discharged Gross from suicide watch on July 28, 2008 and sent him back to SHU for twenty days.  Although a three day follow-up after an inmate is discharged from suicide watch is required by NHSP Policy and Procedure Directive ("PPD") 6.10, none was ever done.  Also contrary to PPD 6.10.[4], Gross was not

---

[4]PPD 6.10, which provides procedures for suicide prevention and intervention at the prison, requires that an inmate

seen weekly by MHU for the one-month period after he left suicide watch.

More than two weeks after he was discharged from suicide watch, Gross received the medication Effexor for his depression. Gross took the medication twice and it nauseated him and caused him to vomit.  Gross sent an IRS to Dr. Fellows seeking a lower dose of the medication, but received no reply.  Gross stopped taking the medication due to the side effects.

On August 10, 2008, Gross was seen by someone from MHU named Dave who discussed RTU placement with him.  Gross explained that he had been waiting for months to return to RTU.

On August 12, 2008, Brett Mooney, a medical nurse at the prison, went to see Gross and opined that he should have been placed on Wellbutrin, and noted in his file that Wellbutrin should be prescribed.  Gross got an appointment to see Mary Rose on September 12, 2008.

On August 26, 2008, Gross left the SHU and went to the Closed Custody Unit.  Two days later, he met with Debby Green and told her he felt like he was losing his mind, that he was

_____

discharged from precautionary or suicide watch are to be followed up by MHU within 72 hours of discharge, and once a week for the first month after discharge.

8

thinking about "cutting up," and how he'd like to end the misery of his life.  Green reminded Gross that he was to see Rose on September 12.  Gross saw Green again on September 10, 2008, and told her he would like to walk down his tier naked, slicing himself up with a razor in order to relieve his stress.  Green at that time stated that she would "like to see [Gross] back on meds."

On September 12, 2008, Gross saw Rose as scheduled.  Gross told Rose he needed medication that did not make him feel more suicidal than he already was.  Gross also told Rose that he saw shadows of people moving in his cell when no one was there.  Rose attributed Gross' hallucinations to his past use of hallucinogenic substances and told him not to look at the shadows when they appeared.  Gross asked Rose if there were a medication available that would help him.  Rose read Gross' file and stated that Mooney had suggested placing Gross on Wellbutrin, but that she wouldn't prescribe that medication because it is subject to being abused by addicts.  Rose agreed, however, to try Gross on a medication called Mirazapine, and stated that the medication should arrive on his unit within three days.  After the passage of several weeks without the medication, Gross finally received

his medication on October 3, 2008.  When he started taking the
Mirazapine, however, Gross slept all day, was angry, anxious,
suicidal, and felt like crying.  Gross stopped taking the
Mirazapine due to its side effects and advised Rose that he
needed a different medication.  Rose answered Gross, telling him
that she would see him again on October 24, 2008.

Gross wrote to Rose on October 9, 2008, chastising her for
letting him "rot" on his unit until October 24 without being
treated.  Rose refused to see him before October 24.

On October 10, 2008, Gross "snapped" and began hacking at
his left wrist with a razor blade.  Gross' cellmate stopped him
from cutting himself and flagged down an officer.  Officers
brought Gross to the medical unit where they taunted him, telling
him that next time he should do a better job and kill himself,
until the nurse on duty told them to stop.  The nurse applied
butterfly strips and bandages to Gross' wrist and placed him on
suicide watch for the weekend.

On the morning of October 13, 2008, Debby Green came to see
Gross and said that she felt that Gross should be treated with
Seroquel, Klonopin, and Wellbutrin.  They discussed what Gross
was doing to stay busy and discussed stressors in his life.

Green told Gross to stay busy until he saw Rose on October 24.
Green then discharged Gross back to his unit.  Green told Gross
to contact her if he needed to talk.

Gross saw Green on October 19, 2008.  They discussed what he
should say to Rose in order to try to obtain medication.

On October 23, 2008, Gross was charged with a disciplinary
infraction for self-mutilation for cutting his own rests.  He was
found not guilty at the disciplinary hearing held on the matter.

On October 24, 2008, Gross had his appointment with Rose.
Rose told him to stop cutting himself because it could kill him.
Gross claims that Rose said she would prescribe Wellbutrin for
him, and that the medication would arrive within four days.
Rose, however, never placed a prescription order or intention to
prescribe Wellbutrin in Gross' file.

On October 28 and 29, Gross sent IRS forms to Rose asking
why he was being denied medication that she had promised.  On
October 30, 2008, when no medication had arrived for Gross, an
officer called the pharmacy and discovered that no medications
had been prescribed.  Gross spoke with his Unit counselor, who
called Rose.  Rose told the counselor that she did not order
medication for Gross.  Rose responded in writing to Gross,

stating that, based on her clinical evaluation and assessment of him, she did not feel that antidepressant medication was indicated.

Gross states that even after advising Dr. Fellows that he was filing suit against Rose in this Court, he refused to provide him with a different prescribing practitioner, and instead urged Gross to work things out with Rose. Gross was readmitted to RTU on November 24, 2008.

<u>Discussion</u>

The Eighth Amendment protects prison inmates from prison officials acting with deliberate indifference to their serious medical needs. See <u>Farmer v. Brennan</u>, 511 U.S. 825, 831 (1994). To assert a viable cause of action for inadequate medical care, a prisoner must first state facts sufficient to allege that he has not been provided with adequate care for a serious medical need. <u>Id.</u> at 831; <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347 (1981); <u>Estelle</u>, 429 U.S. at 106. The inmate must then allege that a responsible prison official was aware of the need or of the facts from which the need could be inferred, and still failed to provide treatment. <u>Estelle</u>, 429 U.S. at 106. A serious medical need is one that involves a substantial risk of serious harm if it is not

12

adequately treated.  See Barrett v. Coplan, 292 F. Supp. 2d 281, 285 (D.N.H. 2003); Kosilek v. Maloney, 221 F. Supp. 2d 156, 180 (D. Mass. 2002) (citing Farmer, 511 U.S. at 835–47); see also Gaudreault v. Municipality of Salem, 923 F.2d 203, 208 (1st Cir. 1990) (defining a serious medical need as one "that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.") (internal citations omitted).  These protections apply to a prison's administration of medical care, including mental health care.  See DesRosiers v. Moran, 949 F.2d 15, 19 (1st Cir. 1991); Torraco v. Maloney, 923 F.2d 231, 234 (1st Cir. 1991) (recognizing deliberate indifference to an inmate's mental health needs violates the Eighth Amendment).

"[A]dequate medical care" is treatment by qualified medical personnel who provide services that are of a quality acceptable when measured by prudent professional standards in the community, tailored to an inmate's particular medical needs, and that are based on medical considerations." United States v. DeCologero, 821 F.2d 39, 42–43 (1st Cir. 1987).  This does not mean that an inmate is entitled to the care of his or her choice, simply that

the care must meet minimal standards of adequacy.  <u>See</u> <u>Feeney v.</u>
<u>Corr. Med. Servs., Inc.</u>, 464 F.3d 158, 162 (1st Cir. 2006) ("When
a plaintiff's allegations simply reflect a disagreement on the
appropriate course of treatment, such a dispute with an exercise
of professional judgment may present a colorable claim of
negligence, but it falls short of alleging a constitutional
violation." (internal citations omitted)).

        Deliberate indifference may be found where the medical care
provided is "so clearly inadequate as to amount to a refusal to
provide essential care."  <u>Torraco</u>, 923 F.2d at 234.  Constraints
inherent in a prison setting may affect the choice of care
provided, and may be relevant to whether or not prison officials
provided inadequate care with a deliberately indifferent mental
state.  <u>Wilson v. Seiter</u>, 501 U.S. 294, 302 (1991).  Allegations
that care provided is substandard, or may constitute malpractice
in the civil arena, are not necessarily sufficient to state an
Eighth Amendment claim for deliberate indifference to serious
mental health needs.  <u>See</u> <u>Feeney</u>, 464 F.3d at 162; <u>Torraco</u>, 923
F.2d at 235 (care provided must have been so inadequate as to be
conscience-shocking).

Here, Gross has stated that he does not feel that the care provided to him has been adequate to resolve his need for medication to treat his depression and anxiety.  Gross' complaint makes clear, however, that approximately six weeks after his incarceration began, he was placed into a residential treatment program equipped to deal with his mental health needs on a daily basis.  Gross spent three months in the program, was discharged, and, eleven months later, was readmitted to the program.  In the approximately twelve to thirteen months that Gross has been in prison and not housed in the RTU, he has seen medical and mental health professionals at least fifteen times regarding treatment for his mental health needs beginning less than a month after admission to the NHSP, and continuing at regular intervals until he was returned to the RTU in November of 2008.  In addition, MHU providers have attempted to treat Gross with four different antidepressant medications, none of which Gross liked taking.  He discontinued each of these medications voluntarily.  Gross contends that he was denied access to medication that would help him, experienced long delays in receiving his medication, and was often not seen by mental health workers with the frequency he would like.  These complaints, however, demonstrate a difference

of opinion between Gross and the MHU care providers, not deliberate indifference.  The facts offered by Gross demonstrate that he received regular mental health care, including medication and counseling, and that he was prevented from seriously harming himself by placement on suicide watch.  Further, Gross was admitted, and then readmitted, to the RTU, a unit where medication, therapy, and daily care for his mental health issues is available to him.  Accordingly, I cannot find that the defendant here, or any official at the NHSP or MHU, provided Gross with constitutionally inadequate care.  Accordingly, I recommend dismissal of this action.

### Conclusion

As I find that Gross has failed to state any claim upon which relief might be granted, I recommend that this action be dismissed.  See LR 4.3(d)(2)(A)(i).  Further, Gross' motion for the appointment of counsel (document no. 15) is denied as moot, subject to renewal should circumstances warrant in the future. Any objections to this Report and Recommendation must be filed within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the district court's order.  See Unauthorized Practice of Law

<u>Comm. v. Gordon</u>, 979 F.2d 11, 13–14 (1st Cir. 1992); <u>United States v. Valencia–Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986).

> ***/s/James R. Muirhead***
> James R. Muirhead
> United States Magistrate Judge

Date:    March 18, 2009

cc:    Elijah E. Gross, pro se

17